# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GARRETT IRWIN, | § | |
| | § | No.   235, 2018 |
| Respondent Below, | § | |
| Appellant, | § | Court Below:   Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. CK16-03072 |
| JENNY SHELBY, | § | Petition No. 16-37170 |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted:   March 6, 2019
Decided:   May 6, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Family Court.   **AFFIRMED**.

Leslie B. Spoltore, Esquire, Oberymayer Maxwell Rebmann & Hippel LLP, Wilmington, Delaware, for Appellant, Garrett Irwin.

Melissa L. Dill, Esquire, Liguori & Morris, Dover, Delaware, for Appellee, Jenny Shelby.

**VAUGHN**, Justice, for the Majority:

# I. INTRODUCTION

The appellant, Garrett Irwin (the father), appeals from a Family Court order granting the appellee, Jenny Shelby (the mother),[1] sole custody and primary residential placement of their two children.[2] The father makes two claims on appeal. First, he contends that the Family Court abused its discretion by siding with the mother's treating psychologist instead of relying on the expert requested by the father. Second, he contends that the Family Court's order granting sole custody and primary placement to the mother was against the weight of the evidence and an abuse of discretion. According to the father, the court drew all inferences in the mother's favor, minimized her mental health and substance abuse issues while giving undue weight to the father's dated history of drug use, ignored the mother's role in their physical altercations, and was generally biased against the father.

The father expresses concern that the Family Court judge was biased in favor of the mother. One view of the record is that the Family Court judge came to the custody dispute predisposed against the father and approached the remainder of the proceedings with a closed mind. But, another view of the record is the Family Court undertook the proper legal analysis, and the factual findings it made in this difficult case with conflicting testimony—not unlike most cases coming before the Family

---

[1] A pseudonym was assigned to each party on appeal pursuant to Supr. Ct. R. 7(d).

[2] *See* Appellant's Opening Br. Ex. A [hereinafter *Custody Order*].

Court—are entitled to deference on appeal. Although we might have weighed the evidence differently and come to a different conclusion, we find that the Family Court's factual determinations have support in the record, and thus affirm its judgment.

## II.   FACTS AND PROCEDURAL HISTORY

The mother and the father first met in 2012 when she went to work in his restaurant in Dover.   Sometime thereafter, they started dating, and eventually, the mother moved into the father's house in Dover.   During their relationship, they agreed to call themselves "husband" and "wife," but they did not marry.   The mother worked many hours at the restaurant until the couple had their first child on November 2, 2013.   She then stopped working regularly.   The couple had their second child on January 25, 2015.   The mother has another minor child (age eight) from a previous relationship, and the father has an adult child with whom he has no relationship.   The father is twenty-six years older than the mother.[3]

While the family was intact, the mother was primarily a stay-at-home mother and provided most of the children's daily care, including taking them to medical and dental appointments.   The father, the primary financial provider, was involved in the children's care to varying degrees.

---

[3] At the time of the custody hearing, the mother was thirty-four years old and the father was sixty years old.

The parties' relationship began to deteriorate, with arguments that sometimes resulted in physical altercations. On November 18, 2016, the mother filed the petition for custody that is now at issue in this appeal.

An incident occurred on November 22-23, 2016 (the "Restaurant Incident").[4] The mother was working at the father's restaurant on the night of November 22, and the father was home with the children. The mother did not return home that evening. The next morning, the father went to the restaurant with the children, who were not properly restrained in child seats, in his truck. He discovered the mother's car in the restaurant parking lot. He entered the restaurant and saw that it was in disarray, but he did not see the mother. He called for emergency assistance. He then went to the mother's car and saw that she was passed out on the floor of the back seat. When the police arrived, they roused her to consciousness and sent her to a hospital in an ambulance.

As a result of this incident, the mother was hospitalized initially for "acute intoxication or withdrawal."[5] During the admission process, in response to questions, she admitted to occasional marijuana use and alcohol consumption but denied any further (non-prescription) drug use. While at the hospital, the mother

---

[4] App. to Opening Br. at A871; *see also Custody Order* at 3-4 (discussing the incident but erroneously noting that it occurred in 2017).
[5] App. to Opening Br. at A221.

3

tested positive for Amphetamine, Cocaine, and THC. [6] She was ultimately transferred to, and remained at, Dover Behavioral Health for ten days to receive inpatient treatment for mental health problems. After release, she continued outpatient treatment.

As part of her treatment, she was evaluated by Dr. Joseph Zingaro, a psychologist, who found that "[s]he presented as someone who is typical for a victim of domestic violence."[7] Specifically, he said she was a victim of "coercive control, which means that it has happened over a fairly long period of time. And she's afraid of the individual, the perpetrator."[8]

On December 3, 2016, the day after the mother was released from Dover Behavioral Health, she (along with the maternal grandmother) went unannounced to the father's residence to retrieve the children, who had remained with the father during the mother's hospitalization. An altercation ensued, resulting in physical contact between the parties and the father's shirt being ripped. The father called 911, and when the police officer arrived he advised the mother to go to the Family Court to handle the custody dispute, and he let the father keep the children.

As a result of this altercation, the parties each sought a protection from abuse ("PFA") order from the Family Court. On December 5, 2016, the mother filed both

---

[6] She was prescribed Adderall, an amphetamine, and had taken it that day.
[7] App. to Opening Br. at A511.
[8] *Id.*

an emergency petition for an *ex parte* PFA order and a petition for a PFA order, each against the father. On that date, a Family Court Commissioner entered an *ex parte* PFA order on her behalf, which included a provision that the parties would have joint custody of the children with residential placement with the mother. Later that same day, the father returned[9] to the Family Court and filed an emergency petition for an *ex parte* PFA order against the mother and a motion to rescind the mother's *ex parte* PFA order, in which he requested custody of the children. He informed the same Commissioner about the mother's substance abuse, recent hospitalization, and the events on December 3. As a result, the Commissioner amended the mother's *ex parte* PFA order to give the parties joint custody with the father having residential placement. The father then filed a PFA petition against the mother on December 14, 2016.

On December 20, 2016, the parties entered into an interim consent order on visitation. On January 9, 2017, the father answered the mother's petition for custody and counterclaimed for custody.

A hearing on the PFA petitions was held on January 10, 2017, and another Commissioner entered PFA orders against each party, finding that both parties had

---

[9] Coincidentally, the father had appeared at the Family Court at the same time as the mother to file a PFA petition against her. The children were with the father, but the mother had contact with one of them. A security guard intervened and gave the child back to the father. At that time, the father left the court to avoid further confrontation.

5

committed acts of physical abuse during the December 3 incident. Both orders gave the parents temporary joint custody with shared residential placement. The shared residential placement was to rotate on a "2-2-3 schedule," beginning with the mother the next day, January 11.[10] The orders further specified that the mother's time with the children was to be supervised by the children's maternal grandmother unless the mother's therapist recommended otherwise. The maternal grandmother was to supervise the exchanges until the parties set up exchanges at the Dover Visitation Center. These orders also required the father to participate in domestic violence counseling and the mother to participate in domestic violence therapy.

The father sought review of the Commissioner's PFA order. The Family Court judge reviewed the order and approved and accepted it in full. Although the mother did not request a review of the PFA order entered against her, the Family Court judge, while recognizing that his review was limited to the PFA order against the father, noted in his order on review that he was "compelled to mention that [his] reading of the transcript le[ft him] unpersuaded that the evidence to support [the father's] petition justifie[d] a finding that [the mother's] actions [met] a definition of abuse."[11]

---

[10] App. to Opening Br. at A33, A38.
[11] *Id.* at A94.

6

On May 31, 2017, the father moved for a custody evaluation to be performed by Dr. Romirowsky, which the court granted.[12] Dr. Romirowsky interviewed and met with each parent separately on multiple occasions, observed them with the children, reviewed court and health records, and conducted collateral interviews. He then prepared a report and recommendation that was admitted into evidence at the custody hearing.

On March 6, 2018, the Family Court held a custody hearing. At the hearing, the court heard testimony from both parents, Dr. Romirowsky, the maternal grandparents, and a friend of the mother's. The court also considered the record from the PFA hearing, which included testimony and a report from the mother's treating physician, Dr. Zingaro, concluding that the mother was a victim of domestic violence because of the father's controlling behavior.

Following the hearing, on April 16, 2018, the court issued an order granting the mother sole legal custody and primary residential placement—a result neither party requested. The mother had sought primary residential placement with the parents having joint custody of the children. The father, on the other hand, sought sole custody and primary residential placement, at least until the mother's drug use issues were resolved.

---

[12] *Id.* at A96-98 (Motion for Custody Evaluation) (requesting a custody evaluation by Dr. Romirowsky); *id.* at A3 (granting motion).

In its order, the court ultimately found that it was in the best interests of the children for the mother to have sole custody and decision-making authority. Before analyzing the best interests of the children, however, the court rejected the recommendation of Dr. Romirowsky's custody evaluation, which recommended that the father be granted sole legal custody of the children with the mother exercising supervised visitation "until the issue of her drug use is clarified."[13] The court rejected the recommendation for three reasons.

First, the court determined that Dr. Romirowsky improperly ignored the fact that this case involved domestic abuse and a victim of that abuse because Dr. Romirowsky testified that "domestic violence [was] irrelevant to [his] evaluation."[14] The court explained that "[i]n his evaluation report and testimony, [he] all but ignored the substantive fact findings of this Court in the transcript of the original PFA hearing and in the Order on Review of Commissioner's Order."[15] The court continued, "[h]e disparaged the report and testimony of Dr. Joseph Zingaro, a fellow psychologist involved in the PFA hearing, with whom [he] disagreed. He also dismissed, without explanation, Mother's suggestions that Father's actions contributed to her mental health challenges."[16]

---

[13] *Id.* at A151.
[14] *Custody Order* at 6.
[15] *Id.*
[16] *Id.*

Second, the court determined that Dr. Romirowsky "decided, unfairly, that Mother was not credible at any level on anything, and that judgment colored most of his observations about Mother as a parent."[17] According to the court, Dr. Romirowsky's testimony "indicated that he was very disturbed by the fact that Mother did not attend an appointment for testing [at his office] and that, in his judgment, Mother lied about being present for the appointment."[18] The court then discussed discrepancies in the testimony regarding this appointment:

> I accept as fact that the appointment was scheduled for Mother, that she did not appear at the appointed time, and that she insisted to [Dr. Romirowsky] later that she was at his office and that no one else was there. But Mother demonstrated that she sent an email message to [Dr. Romirowsky's] office manager indicating she was running late and may have been confused about the appointment date. Mother also testified that she arrived at [his] office and no one was there. [Dr. Romirowsky] confirmed that his office suite door is kept locked. And he never saw the email message Mother sent to the office manager. He made no suggestion that Mother's late arrival would be accommodated. [He] appeared to be personally offended by Mother's actions.[19]

The court also discussed and dismissed Dr. Romirowsky's other reasons for discrediting the mother. Although Dr. Romirowsky "was further disturbed by indications in Mother's medical record [that] she missed several appointments with

---

[17] *Id.*
[18] *Id.*
[19] *Id.* at 6-7.

9

her nurse practitioner, seemingly contradicting Mother's claim she complied with her treatment program," the court reviewed the medical record and found that "Mother made up most of the missed appointments."[20]  The court noted that Dr. Romirowsky "either did not notice this fact or disregarded it."[21]  According to the court, Dr. Romirowsky "also found Mother's statements denying drug use made by Mother on November 23, 2017 to be conclusive of her deceitfulness in light of the positive tests for cocaine and marijuana performed on Mother that same day."[22] The court, however, attached "much less significance to the statements Mother made while she recovered from an intense and traumatic delusional incident than d[id Dr. Romirowsky]" because the medical reports indicated that she was "unable to focus" and was experiencing "paranoid delusions."[23]  The court explained that it did not understand why Dr. Romirowsky "latched on to some of the things Mother said while ignoring other things she said, unless he decided she is a liar and he needed no more information."[24]

The court noted that Dr. Romirowsky "attached great significance to the fact that he told Mother to have her hair follicles tested for drugs in her system and, as

---

[20] *Id.* at 7.

[21] *Id.*

[22] *Id.*  The court must have been referring to the statements the mother made at the hospital the morning after the Restaurant Incident, which actually occurred on that date in 2016, not 2017. *See* App. to Opening Br. at A160.

[23] *Custody Order* at 7.

[24] *Id.*

of the hearing, he received no indication that Mother followed this instruction."[25] In dismissing this reason for not trusting the mother, the court explained that Dr. Romirowsky "could not recall the date of this instruction" and "guessed that he gave Mother this instruction at the end of December."[26] The mother, however, testified that Dr. Romirowsky "gave her no such instruction and when she learned, recently, that a hair follicle test was expected of her, she had one done."[27] But because the mother did not introduce any evidence of the results of this test, the court concluded that "[t]he evidence associated with this fact is insufficient for any finding."[28]

Third, the court found that Dr. Romirowsky "applied a different standard to his evaluation of Father than the standard he applied to Mother."[29] According to the court, "[t]he facts available to [Dr. Romirowsky] indicated that Mother had used marijuana casually and had used cocaine twice in her life, once during the November 22-23, 2017 incident at the restaurant, and once (by Mother's admission) while in high school."[30] Regarding the father, the court noted that he had admitted to Dr. Romirowsky that "he used marijuana and cocaine while in his twenties, thirties and forties."[31] Thus, the court found that Dr. Romirowsky applied a different standard

---

[25] *Id.*
[26] *Id.*
[27] *Id.* at 8.
[28] *Id.*
[29] *Id.*
[30] *Id.* Again, the court incorrectly referred to the Restaurant Incident as occurring in 2017.
[31] *Id.* Dr. Romirowsky's report actually describes substance abuse occurring during the father's "teens, twenties, and thirties." *Id.*

11

to the mother because he "found that Mother's substance usage directly affected her parenting ability and had no comment about any impact of substance use on Father's parenting ability."[32] Ultimately, the court found that Dr. Romirowsky's report was "not helpful."[33]

The court then analyzed the best interests of the children as required by 13 *Del. C.* § 722(a). Although the court discussed all eight statutory factors, factors (1), (3), and (5) through (8) are at issue on appeal. The court found factor (1), "[t]he wishes of the child's parent or parents as to his or her custody and residential arrangements," to be neutral.[34] The court explained: "Each parent seeks placement of the children. Mother asks the Court to award joint custody to the parties. Father seeks exclusive custody of the children."[35]

As to factor (3), which concerns the interaction and interrelationship of the children with their parents, grandparents, siblings, and others family members, the court found that it weighed in the mother's favor because she "presented persuasive evidence she has a positive and healthy relationship with the children."[36] In support, the court noted the following observations: the mother "ha[d] been engaged with them as their primary care giver for their entire lives"; the children were "very

---

[32] *Id.*
[33] *Id.*
[34] *Id.* at 8, 8-9, 12 (quoting 13 *Del. C.* § 722(a)(1)).
[35] *Id.* at 9.
[36] *Id.*

12

familiar" with their maternal grandmother, "who assisted in caring for them," and had a "good relationship" with their maternal grandfather; and the mother's other minor child had an "important relationship" with the children.[37]

As to the father, the court found that his testimony—that the mother "had been 'unstable' for the past three years" and that "he suspects she was using marijuana and cocaine"—was "not credible."[38]  The court explained, "[h]is suspicions did not move him to make sure he was home with the children more often or for more time, but they convinced him to limit the money he provided to Mother."[39]  Furthermore, the court noted that although the father "stepped up to provide care for the children since late November of last year," there was "unrebutted testimony he generally provided no holiday gifts to the children."[40]  The court also recognized that the father testified that the children were building relationships with paternal-side cousins and that he has no relationship with his thirty-three-year-old daughter (the children's half-sister) "because her mother 'sabotaged' the relationship."[41]  The court concluded, "[f]actor 3 favors Mother's position.  The children have

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*  Because the court issued its decision in 2018, "late November of last year" would be November 2017.  But the Restaurant Incident occurred in November 2016, and from that point forward, the father had either primary placement or shared placement of the children, except for the period of August 14, 2017, through September 8, 2017, due to a stay of visitation that had been granted *ex parte* but was later vacated following an adversarial hearing.
[41] *Id.* at 9-10.

historically done well while in Mother's care. Father has little history to support his claim."[42]

The court found that factor (5), which considers the mental and physical health of all individuals involved, was neutral provided that the mother complied with her treatment:

> Mother has mental health issues that require professional attention. She takes medication and is monitored by a nurse practitioner. . . . Mother acknowledges her need for talk therapy. Father and the children present no health issues. When Mother complies with treatment, this factor (Factor 5) is neutral. If Mother fails to comply with treatment, this factor would favor Father's position.[43]

The court found factor (6), the parents' past and present compliance with their rights and responsibilities for their children under Delaware's family law, to favor the mother "to a slight degree."[44] The court found that "Mother handled the children's medical appointments" and that while "Father participated in medical appointments early in the children's lives," he had not in recent years.[45] The court noted that "Father provided most of the financial support while the family was intact."[46] "Since the split," the court continued, "Mother has relied on Maternal

---

[42] *Id.* at 10.
[43] *Id.*
[44] *Id.* at 10-11.
[45] *Id.* at 10.
[46] *Id.*

14

Grandparents for support while she seeks employment. Father has provided no money to support the children when in Mother's care, but he has provided clothing, and since late December 2017 he has shared in the actual care responsibilities."[47]

The court then discussed the parties' actions on the night of the Restaurant Incident:

> When Father took the children to his restaurant on the morning of November 23, 2017, after Mother did not return home from work, Father transported them in a pickup truck with no child safety seats. He testified that he tried to contact Maternal Grandmother to look after the children, but was unsuccessful in reaching her. Father believed this was an "emergency" situation, justifying the risk to the children. His testimony was not clear about whether he left home that morning, putting the child at risk of injury, because he wanted to check on Mother or on the restaurant. Mother used poor judgment in using substances that contributed to her decompensation on November 22, 2017, but that bad judgment was exercised when she did not have these children in her care. Father's exercise of bad judgment is alarming because he put the children at risk.[48]

The court then concluded, "Factor 6 favors Mother's petition, to a slight degree."[49]

As to factor (7), evidence of domestic violence, the court explained that "[t]his family has an important domestic violence problem"[50] and found that "[t]he great

---

[47] *Id.* at 10-11. Again the court referred to the incorrect year. *See supra* n. 41.
[48] *Custody Order* at 11 (footnote omitted). Again the court referred to the incorrect year (2017 as opposed to 2016).
[49] *Id.* at 11.
[50] *Id.*

weight of the domestic violence evidence favors Mother's petition."[51]  The court

explained its reasoning:

> This Court has previously decided that Father committed abuse against Mother in several ways.  On December 3, 2016,[52] during a dispute over the children and while the children were present, Father shoved Mother up against a car multiple times, causing injury to her that required medical attention.  Father also suggested to Mother she "slit her wrists," again while a child was present.  Father admitted throwing hot coffee on Mother in anger and that one child knew of Father's actions.  Father also threatened Mother he would confuse her for a burglar and "shoot" her.  This Court also found considerable support in the testimony and report of Dr. Joseph Zingaro that Mother was the victim of a pattern of coercive control by Father.
>
> Father has completed a treatment course designed of [sic] people who have committed acts of abuse, as required by the January 10, 2017 PFA order entered against him.
>
> I note that Mother also committed abuse against Father, according to the Commissioner who ruled on the PFA petitions, by ripping Father's shirt during the altercation that caused Mother's injuries, and by "yelling and screaming."  Mother was evaluated by the same service provider who treated Father.  She did not need to take the course.[53]

---

[51] *Id.* at 12.

[52] The court stated the correct year for this incident, which occurred the day after the mother was released from the hospital following the Restaurant Incident.

[53] *Id.* at 11-12 (footnotes omitted).

16

Regarding factor (8), the criminal histories of the parties, the court noted that "Mother was convicted of shoplifting before these children were born" and that "[b]oth Mother and Father have many traffic and automobile related charges."[54] The court concluded, "The criminal histories of both parties are of no significance."[55]

Finally, the court summarized its analysis of the best interests factors. The court explained that "factors 3, 6 and 7 favor Mother's Petition, none of the factors favors [sic] Father's Petition, and the remaining factors are neutral."[56] The court concluded by noting additional reasons for its decision to give the mother sole custody of the children:

> Father's priorities have been business- and money-related. He has developed little experience and skill in parenting. He is inclined to act inappropriately, and sometimes violently, when angry. He needs to be in control and does not share control well. These qualities weigh in favor of vesting Mother with decision authority.[57]

The court then gave the mother sole custody and primary placement of the children, with the father having the right to visit with the children every other weekend.

---

[54] *Id.* at 12.
[55] *Id.*
[56] *Id.*
[57] *Id.*

## III. DISCUSSION

The father's first claim on appeal is that the Family Court abused its discretion when it rejected the expert testimony, opinion, and recommendation of Dr. Romirowsky. According to the father, the Family Court erred when it found that (1) Dr. Romirowsky ignored the fact that this case involved domestic abuse, (2) assessed mother's testimony as credible, and (3) applied a different standard of evaluation to the mother compared to the father.

When the Family Court decides to accept the opinion of one expert over another, the court "has considerable latitude in determining what weight to give to any expert witness testimony in a 'best interests of the child' analysis, and we have held it improper to consider any expert recommendation binding on that court."[58] Moreover, "[t]his Court will not disturb the Family Court's determination of questions of credibility on appeal unless clearly erroneous."[59] Even if we might have reached a different conclusion, a credibility determination is not clearly erroneous if it is supported by the record and the product of an orderly and logical deductive process.[60] After carefully reviewing the record, we find that the father's

---

[58] *Kraft v. Kraft*, 29 A.3d 246, 2011 WL 4572911, at *3 (Del. Oct. 4, 2011) (TABLE).
[59] *Boyer v. Poole*, 815 A.2d 348, 2003 WL 141267, at *3 (Del. Jan. 17, 2003) (TABLE) (citing *Wife (J. F. V.) v. Husband (O. W. V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979)).
[60] *Wife (J. F. V.)*, 402 A.2d at 1204.

18

claims of error with regard to Dr. Romirowsky's report fall within the court's broad discretion to accept the conclusions of one expert over another.

First, with regard to the father's claim that the court erred when it held that Dr. Romirowsky failed to adequately consider the evidence of domestic violence, the record shows that Dr. Romirowsky testified that "the whole issue of abuse or domestic violence really is irrelevant to my consideration and my recommendation."[61] Further, there was evidence in the record of abuse—the "imbalance of power and control" between the mother and the father[62]—found by Dr. Zingaro and the court in the PFA hearing. The father was approximately thirty years older than the mother, he was her employer, and she testified that he controlled the money, her work schedule, and even how she dressed. While Dr. Romirowsky raised some valid concerns with Dr. Zingaro's methodology, the court was free to decide which expert it found to be credible and to rely upon the court's earlier finding—by a different judicial officer—of the father's domestic abuse.

As to the court's second reason for rejecting Dr. Romirowsky's report—that Dr. Romirowsky determined that the mother completely lacked credibility—Dr. Romirowsky's report concluded that the mother had a "history of noncompliance" and a "pattern of not telling the truth."[63] This conclusion was primarily founded

---

[61] App. to Opening Br. at A669.
[62] *Custody Order* at 5.
[63] App. to Opening Br. at A150.

19

upon two incidents: one occasion where the mother did not attend a scheduled appointment for psychological testing at Dr. Romirowsky's office and another where she failed to comply with a hair follicle drug test he had requested. There was conflicting testimony relating to Dr. Romirowsky's reasons for finding the mother deceitful. It was the role of the court, as fact finder, to resolve these conflicts and make credibility determinations. As to the mother's purported failure to have her hair follicles tested for drugs in her system, again, there was conflicting testimony. Dr. Romirowsky could not recall the date of his instruction, and the mother testified that he gave her no such instruction, but that when she recently learned that a hair follicle test was expected of her, she had one done. The court was in the best position to judge the credibility of the testimony.

The court also gave several other reasons for finding that Dr. Romirowsky unfairly determined that the mother completely lacked credibility. The court noted that it did not understand why Dr. Romirowsky "latched on to some of the things Mother said while ignoring other things she said" in evaluating her credibility.[64] For example, Dr. Romirowsky found the mother's statements denying drug use during her intake examination following the Restaurant Incident "to be conclusive of her deceitfulness in light of the positive tests for cocaine and marijuana performed

---

[64] *Id.* at 7.

on Mother that same day." [65] The court, by contrast, attached "much less significance to statements Mother made while she recovered from an intense and traumatic delusional incident than d[id Dr. Romirowsky]." [66] Because this aspect of the court's decision involved a determination of the weight to be assigned by the mother's statements in the context of the factual circumstances and because the Family Court judge was in the best position to weigh this conflicting evidence, we will not substitute our opinion for that of the trial judge. [67]

Finally, as to the court's third reason for rejecting Dr. Romirowsky's report— that Dr. Romirowsky gave much greater weight to the mother's drug use than the father's record of his own drug use—we agree with the father that the Family Court's determination is questionable, given the passage of time since his last use of drugs. [68] But, in our view, the Family Court had the best vantage point to judge the weight to be given the expert reports in light of the testimony of the mother and the father. The other reasons given by the Family Court to reject Dr. Romirowsky's report were sufficient to support the court's decision on appeal.

The father's second claim on appeal is that the Family Court abused its

---

[65] *Id.*

[66] *Id.*

[67] *See Wife (J. F. V.)*, 402 A.2d at 1204 ("When the determination of facts turns on a question of credibility and the acceptance or rejection of the testimony of witnesses appearing before him, those findings of the Trial Judge will be approved upon review, and we will not substitute our opinion for that of the trier of fact.").

[68] The Family Court also incorrectly stated father's illegal drug use as occurring most recently in his forties, not his thirties, although both periods were decades removed from the hearing.

21

discretion when it denied his request for sole legal custody and primary placement of the children and instead granted the mother sole legal custody—despite her asking for joint custody—and primary placement. He contends that the court's conclusions were not supported by the record and were not the product of an orderly and logical deductive process. He further argues that the court did not independently consider the statutory best interests factors and give each factor its due weight.

Our review of a custody decision of the Family Court "extends to a review of both the facts and law as well as to inferences and deductions drawn by the Family Court."[69] "To the extent an appeal implicates findings of facts, the scope of our review is limited to whether the findings are sufficiently supported by the record and are not clearly wrong."[70] "Moreover, this Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those inferences are supported by the record and are the product of an orderly and logical deductive process."[71] "If the Family Court has correctly applied the law, our review is for an abuse of discretion."[72] To the extent the issues on appeal implicate rulings of law, we conduct a *de novo* review.[73]

[69] *Potter v. Branson*, 877 A.2d 52, 2005 WL 1403823, at *2 (Del. June 13, 2005) (Table).
[70] *Kraft*, 2011 WL 4572911, at *2.
[71] *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).
[72] *Potter*, 2005 WL 1403823, at *2.
[73] *Id*.

The father begins his argument by claiming that the court's findings deviate from the record and are erroneous. He provides examples of his interpretation of the court's erroneous findings; however, the findings in these examples are either supported by the record or are not significant findings when evaluated independently from the analysis of the best interests of the children. Accordingly, these claims of erroneous findings will be evaluated in the context of the best interests analysis.

Under 13 *Del. C.* § 722, the Family Court is required to determine legal custody "in accordance with the best interests of the child."[74] In determining the best interests of the child, the court must consider "all relevant factors," including eight factors enumerated by the statute.[75] The father argues that the trial judge's findings relating to factors (1), (3), and (5) through (8) were unsupported by the record and not the product of an orderly and logical deductive process.[76] When an appeal implicates findings of facts, the scope of review "is limited to whether the findings are sufficiently supported by the record and are not clearly wrong."[77]

Factor (1) concerns "[t]he wishes of the child's parent or parents as to his or her custody and residential arrangements."[78] The father argues that the Family

---

[74] 13 *Del. C.* § 722(a).
[75] *Id.*
[76] Factors (2) and (4) were considered by the Family Court, but these factors are not at issue on appeal because there was no direct evidence relating to factor (2) and factor (4) did not favor either party. The father does not dispute these findings.
[77] *Kraft*, 2011 WL 4572911, at *2.
[78] 13 *Del. C.* § 722(a)(1).

Court provided "no analysis but seem[ed] to consider this Factor to be neutral."[79] Although the court did not say which parent this factor favored in its discussion of this factor, in the conclusion of its best interests analysis, the court explained that "factors 3, 6 and 7 favor Mother's petition . . . and the remaining factors are neutral."[80] The father argues that this factor favors him because the mother provided a mother-centric reason for primary placement instead of a child-centric reason. He further states that his argument for sole custody and primary placement was his "desire to parent and his concern for Mother's ability to parent."[81]

As the court explained in its decision, each parent desired placement of the children, with the mother requesting joint custody and the father seeking sole custody. The father's argument that the mother provided a "mother-centric," as opposed to a "child-centric," reason for custody does not relate to factor (1). This factor considers only the "wishes of the child's parent or parents."[82] Factor (2), which the father does not contest, is the "child-centric" factor; it considers "[t]he wishes of the child as to his or her custodian or custodians and residential arrangements."[83] The father's argument that factor (1) favors him is strained and unpersuasive.

---

[79] Appellant's Opening Br. at 32.
[80] *Custody Order* at 12.
[81] Appellant's Opening Br. at 32.
[82] 13 *Del. C.* § 722(a)(1).
[83] *Id.* § 722(a)(2).

The court found that factor (3), which evaluates the child's interaction and relationships with his or her parents and other family members,[84] favored the mother for several reasons supported by the record. These reasons included the fact that the children had historically done well when in her care, the mother had been their primary caregiver when the family was intact, the children were very familiar with their maternal grandparents, and the children had an important relationship with the mother's other minor child.

With respect to this factor, the father contends that the court erred by determining that he "has little history to support his claim"[85] and "has developed little experience and skill in parenting."[86] In particular, he argues that the court erred in calculating his time with the children when the court stated that he "stepped up to provide care for the children since late November of last year."[87] This statement, according to him, was incorrect, and "not merely a typographical error," because it suggests that the court was referring to November 2017, not November 2016, which discredits the period of time he had primary and shared placement by one year in the court's analysis of factor (3).[88]

---

[84] *Id.* § 722(a)(3).
[85] *Custody Order* at 10.
[86] *Id.* at 12.
[87] *Id.* at 9.
[88] Appellant's Opening Br. at 33.

The procedural history detailed by the court in its decision, and the court's involvement in the case, shows that its reference to November 2017 as the time the father "stepped up" to provide care for the children was a typographical error and not a calculation it relied upon for its analysis. The father "stepped up" to provide care after the Restaurant Incident, which the court stated "took place on November 22-23, 2017,"[89] but which actually occurred on those dates in 2016. The trial judge became involved in the case at least by May 18, 2017, when he reviewed and accepted the commissioner's protection from abuse order that was issued against the father on January 10, 2017. His May 2017 review order indicated that he was aware of the correct date for the Restaurant Incident[90] and also indicated that he was aware of the shared placement arrangement established by the commissioner on January 10, 2017.[91] In the court's decision on the custody dispute, the trial judge explained, "[t]his incident [the Restaurant Incident] was a subject of the hearing on the cross-PFA petitions and the later Order on Review of a Commissioner's Order."[92]

Furthermore, while the trial judge should have noted the correct date when discussing these events, the court did not focus on precisely when the father's

---

[89] *Custody Order* at 3.

[90] App. to Opening Br. at A85 (discussing the Restaurant Incident and noting that it occurred on November 22, 2016).

[91] *Id.* at A87 ("The Court entered cross Orders of Protection from Abuse and granted the parties joint legal custody and shared residential placement of the minor children."); *id.* at A87 n.4 ("The Court awarded shared residential placement on a 2-2-3 schedule, beginning with Mother on January 11, 2017.").

[92] *Custody Order* at 3.

increased care of the children occurred, but rather focused on the several reasons favoring giving custody to the mother, the father's entire history of caring for the children, and the children's relationships with other family members. The court explained that "[t]here was unrebutted testimony [the father] generally provided no holiday gifts to the children."[93] Although the court acknowledged the father's testimony that the children had a good relationship with their paternal grandfather and had recently began building relationships with paternal-side cousins, it also noted that the father had no relationship with his thirty-three-year-old daughter, the children's half-sister. The children, moreover, were very familiar with their maternal grandparents, who assisted in caring for them, and had an important relationship with the mother's other child. Ultimately, the court's reference to the wrong date was just one aspect of its overall analysis and does not amount to reversible error.

The court found factor (5), "[t]he mental and physical health of all individuals involved,"[94] to be neutral. The court explained, "[w]hen Mother complies with treatment, this factor (Factor 5) is neutral. If Mother fails to comply with treatment, this factor would favor Father's position."[95] The father contests that conclusion,

---

[93] *Id.* at 9.
[94] 13 *Del. C.* § 722(a)(5).
[95] *Custody Order* at 10.

arguing that the mother has not complied with treatment as evidenced by her attendance record, which indicates she missed appointments.

The court, however, recognized that the mother takes medication, is monitored by a nurse practitioner, and acknowledges her need for talk therapy. Also, when dismissing Dr. Romirowsky's determination that the mother lacked credibility because she missed appointments with her nurse practitioner, the court noted that its "review of the medical record indicates that Mother made up most of the missed appointments."[96] This was supported by the record: the mother testified at the custody hearing that she had been attending therapy sessions every month since the Restaurant Incident except for two or three months during the summer of 2017, when her car was getting repaired and when she was meeting with Dr. Romirowsky (because she "thought that [he] was [her] therapist").[97]

The court found factor (6), the parents' past and present compliance with their rights and responsibilities under Delaware's family law,[98] to favor the mother "to a slight degree."[99] The father contends that the court erred as to this factor because it subjected him to a higher standard than the mother. He argues that the court was swayed by its finding that the father did not provide money to support the children

---

[96] *Id.* at 7.
[97] App. to Opening Br. at A773.
[98] 13 Del. C. § 722(a)(6).
[99] *Custody Order* at 11.

28

when in the mother's care. He points out that he provided clothing and financial support for the children when they were with him and that since the family separated, the mother had not worked—by her own choice—and instead depended upon her parents for support. He also argues that the court placed undue emphasis on his driving the children to the restaurant the morning of the Restaurant Incident without car seats and inappropriately minimized the mother's poor judgment of "choosing to use cocaine, drink alcohol, abuse Adderall and stay out all night" by not recognizing that the "aftermath of this 'poor judgment' rendered Mother unavailable to provide care for ten days."[100]

Given the exigencies of the situation, we agree that the trial judge placed undue emphasis on the fact that the father did not have the children in child seats on the morning of the Restaurant Incident. But, as to the mother's "poor judgment," the trial judge reasoned that the mother's "bad judgment was exercised when she did not have these children in her care."[101] Although we may have made a different finding on this factor, we are satisfied that the trial judge's finding that factor (6) favored the mother "to a slight degree" is sufficiently supported by the record and not clearly wrong. And, as noted before, the test is not a rigid application of any

---

[100] Appellant's Opening Br. at 38.
[101] *Custody Order* at 11.

one factor in the analysis. The court must consider all factors to arrive at an overall custody and placement decision.

The court found factor (7), evidence of domestic violence,[102] to weigh heavily in the mother's favor. The father contests this conclusion, relying largely on an argument he made regarding the court's rejection of Dr. Romirowsky's report—that the record did not support the court's findings on domestic abuse. Although the court considered the acts of domestic violence by both parties in its analysis, it highlighted the father's acts of emotional and physical abuse and relied on Dr. Zingaro's testimony and report that the mother was the victim of a pattern of coercive control by the father and the court's earlier finding of abuse. Therefore, the court's finding of domestic abuse was supported by the record.

The court found factor (8), the criminal history of the parents,[103] to be of no significance because the criminal history of both parties occurred before the children were born. The father argues that the court erred as to this factor for two reasons: (1) it omitted the salient fact that the mother involved her oldest child in her shoplifting by hiding the stolen item in her stroller and (2) it imposed a different standard on him than it did on the mother by considering his past drug history while not taking into account the mother's prior shoplifting conviction. First, although

---

[102] 13 *Del. C.* § 722(a)(7).
[103] *Id.* § 722(a)(8).

30

the court did not address the fact that the mother's oldest child was with her when she shoplifted, the father points to no evidence indicating that the child was put at risk or that the mother has engaged in similar criminal activity involving the children since then. Second, the court did not consider the father's dated substance abuse for this particular factor.

In addition to his contentions challenging the court's findings as to the individual factors, the father contends that the court did not independently consider the best interests factors and give each its due weight. In support of this contention, he cites *Holmes v. Wooley*.[104] In *Holmes*, although the trial judge weighed the best interests factors, his ultimate finding was the result of a mechanical, quantitative weighing of the factors with each factor having the same value irrespective of their relative strengths based on the actual facts in the case.[105] This Court found that method of analysis to be erroneous because the Family Court considered only the enumerated factors in the statute, did not consider all relevant factors as required by the statute, and ultimately determined the best interests of the child based solely on which parent had "prevailed" in the majority of the statutory factors.[106] The father asserts that the Family Court performed this same mechanical and perfunctory analysis in weighing the best interests factors.

---

[104] 788 A.2d 131, 2002 WL 27436 (Del. Jan. 3, 2002) (TABLE).
[105] *Id.* at *1.
[106] *Id.*

Although the Family Court here weighed the factors quantitatively, the court also conducted a qualitative analysis of each factor and of all factors considered together. For example, while considering factor (7), the court explained that "[t]he great weight of the domestic violence evidence favors Mother's petition."[107] This suggests that the court did not simply assign to each factor equal weight. Moreover, in explaining its ultimate decision, the court noted several reasons why it was in the children's best interests for the mother to have sole custody and decision-making authority: "Father's priorities have been business- and money-related. He has developed little experience and skill in parenting. He is inclined to act inappropriately, and sometimes violently, when angry. He needs to be in control and does not share control well."[108] The trial judge further found that "[t]hese qualities weigh in favor of vesting Mother with decision authority."[109] These statements indicate that the court considered all relevant factors in determining that placement with the mother was in the best interests of the children and in concluding that sole custody with the mother, although not requested in her petition filed in November 2016, was justified—especially given the court's finding that the father "does not share control well."[110]

---

[107] *Custody Order* at 12.
[108] *Id.*
[109] *Id.*
[110] *Id.*

## IV. CONCLUSION

Because the father contests the Family Court's factual and credibility determinations, his path to reversal is extremely narrow. The Family Court analyzed each of the required factors, heard from the experts, the mother and the father and another witness for the mother, and made a custody determination supported by the record. Thus, we affirm the judgment of the Family Court.

While we have decided to affirm, we also note with some discomfort the father's concern that the Family Court judge came to the custody hearing predisposed against the father. The trial judge did, it seems to us, place undue emphasis on the fact that the father drove to the restaurant on the morning of the Restaurant Incident without having the children in child seats. The record indicates that he attempted to contact the maternal grandmother to look after the children while he went looking for the mother, but was unable to contact her. Without depreciating the importance and necessity of using child seats when transporting children, the father reasonably believed that he was dealing with an emergency. Under the circumstances, the fact that he kept his children with him and by necessity used a vehicle not equipped with child seats had little probative value in deciding custody. We also think that the father's drug use of long ago, discussed in connection with Dr. Romirowsky's report, was a factor made irrelevant by the passage of time. Finally, the trial judge's misstatement that the Restaurant Incident

33

occurred in 2017, when it in fact occurred in 2016, was unfortunate and caused unnecessary confusion.

Some time has passed since the Family Court's custody and placement determination. We believe that, if the father choses to do so, and in light of this opinion, the Family Court should consider a renewed petition for joint custody by the father when permitted by 13 *Del. C.* § 729(c)(2) with the assistance of a new expert opinion from an expert selected and appointed by the court.

**STRINE**, Chief Justice, dissenting, with **TRAYNOR**, Justice, joining:

We respectfully dissent from the majority opinion. Our review of the father's arguments on appeal leads us to conclude that the Family Court's decision is not rationally grounded in the record evidence. If anything is clear from this record, it is that, like other human beings, neither the Father nor the Mother are close to perfect. But if children were only entitled to the love and care of perfect parents, all of us would be orphans. We hope that if the Father remains involved in the children's lives in a positive and loving way, that the trial judge will consider in an impartial and open-minded way any future applications by him to become more involved in his children's lives. For now, we can only say that we would reverse and restore the Father to having the status as joint custodial parent, a status that was taken from him not at the Mother's request, but at the spontaneous instance of the Family Court.